**IN THE UNTIED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HP Tuners  LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-2063 |
| | ) | |
| Worldly Exhibits | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, HP Tuners LLC ("HPT"), by and through its attorney, Michele J. Braun,

submits the following as and for its complaint against Worldly Exhibits ("WE" or "Defendant"):

## PARTIES

1.      Plaintiff, HPT, is a foreign limited liability corporation, engaged in the business

of, among other things, providing cost effective tuning and data acquisition solutions for

enthusiasts and professional shops within the automotive industry. HPT was incorporated in the

State of Nevada and, at all times relevant herein, HPT's principal place of business was in

Buffalo Grove, Illinois.

2.      Defendant, WE, is engaged in the business of providing comprehensive event

management solutions, including, but not limited to, customized booth and/or tradeshow exhibits

and packages that are tailor made for the event. WE is not incorporated and, at all times relevant

herein, operated its business in Indianapolis, Indiana.

## JURSIDICTION AND VENUE

3.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. 1332(a) in that

the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between

citizens of different states.

4.      Venue is proper in the United State District Court for the Northern District of Illinois, Eastern Division, in that a substantial part of the events giving rise to this claim took place within this district.

## FACTS COMMON TO ALL COUNTS

5.      On or about August 29, 2017, HPT's Brand Manager, Nader Rayes ("Rayes"), contacted WE's Exhibit Consultant/Designer, Robert Bowman ("Bowman"), by phone, in order to determine how much WE would charge HPT to build a custom made display booth and hanging sign for HPT's use at the upcoming SEMA trade show in Las Vegas, Nevada that was to be held between October 31, 2017 and November 3, 2017.

6.      Rayes contacted WE to obtain this cost estimate after hearing about WE through SEMA and reviewing the flyer that WE had previously mailed to HPT's offices in Illinois.

7.      During the course of this phone conversation, Rayes explained and Bowman agreed that the booth would be constructed in accordance with HPT's blueprints and designs and that the hanging sign would be constructed in accordance with SEMA's requirements for the tradeshow.

8.      During the course of this conversation and several phone conversations thereafter, Bowman stated that WE was a full service company and that, as part of its custom exhibit package, WE would deliver HPT's booth and sign to the tradeshow themselves along with everyone else's booths at SEMA and provide a team to set up the booth as well as a supervisor to oversee the set-up, at no additional cost.

9.      Relying on Bowman's representations, Rayes submitted HPT's design drawings for the booth to WE for the cost estimate along with pictures of other booths HPT liked and a sample BREMO sign as a reference for the type of hanging sign that HPT wanted to use at the tradeshow.

2

10. On or about August 30, 2017, Bowman sent Rayes WE's initial cost estimate for the project via email.

11. Before accepting this estimate or any revised estimate, Rayes advised Bowman via his 9/5/17 emails that certain changes needed to be made to the initial design of the booth, including the design of the lines and back-lighting.

12. In his September 6, 2017 email, Bowman agreed that HPT's proposed changes would make the booth look better and asked Rayes to submit updated blueprints so he could provide HPT with an Invoice.

13. On or about September 7, 2017, HPT sent WE the revised blueprints via email.

14. After confirming receipt of the revised blueprints and acknowledging that these changes would be made, Bowman sent Rayes Invoice No. 91547, dated September 7, 2017, via email. The total price reflected on this Invoice was $36,473.62. *see* Exhibit A.

15. Upon reviewing the Invoice, HPT's Director of Operations, Bobbi Munson, noticed that the Invoice quoted a price for a rental package, a request that HPT never made.

16. HPT's Marketing Director, Andrew Mernone ("Mernone"), brought this error to Bowman's attention that same day.

17. In response, Bowman emailed a Purchase Invoice to Rayes, dated 9/12/17, that increased the total price to $43,768.35. *see* Exhibit B.

18. When Rayes asked Bowman via email on September 7, 2017 whether HPT could split the payment in two, Bowman advised Rayes that WE had to have full payment prior to the start of fabrication and ordering of materials.

19. On or about September 13, 2017, HPT complied with WE's demand for full payment by wiring $43,768.35 to WE. *See* Exhibit C.

20.    When Mernone asked Bowman for an estimated completion date via his 9/7/17 email, Bowman responded that fabrication should be completed by October 13, 2017, the latest.

21.    On or about October 9, 2017, Rayes asked Bowman when HPT could expect WE's team to set-up their exhibit at the trade show.

22.    Contrary to his August 29, 2017 representation, Bowman responded that WE would not be sending out a team to set-up the exhibit but would still be able to send a supervisor to oversee the set-up at no additional cost since WE would have a supervisor at SEMA, overlooking the set-up of other booths at the tradeshow.  Bowman suggested that HPT hire Freeman, the convention center's union contractor, to set-up the booth and confirmed in his October 11, 2017 email to Rayes that WE would provide the supervisor.

23.    At no time during the course of this correspondence or at any time thereafter did Bowman or anyone from WE advise HPT that there would be an additional cost for the supervisor.

24.    Having no alternative for setting up the exhibit, HPT hired Freeman to do so.

25.    On or about October 13, 2017, a phone call was had between Bowman and Rayes in which Bowman confirmed that WE would be sending its own truck to deliver HPT's booth and sign and that their supervisor would be on that truck.

26.    On or about that same date, Scott Steinbrook ("Steinbrook") from WE advised Rayes that the hanging sign had to be remade because, after WE sent its measurements to the maker, WE learned that SEMA would only allow a 20 X 20 sign to be displayed for HPT's exhibit. Steinbrook not only acknowledged that this was WE's error, he said nothing about charging HPT for having the sign remade.

27.    Contrary to Bowman's October 13, 2017 representation, Steinbrook advised Rayes via his October 18, 2017 email that "the booth would be shipped on Tuesday at 9 a.m.

4

from our place to Vegas." *See* Exhibit D. There was no mention of the shipment being made by a third party at that time or at any time prior to WE's October 27, 2017 email. *see* Exhibit D.

28.    In his October 18, 2017 emails to Rayes, Steinbrook also stated that (1) Freeman could start the build at 8:00 a.m. on Saturday, October 28, 2017; (2) HPT would need 4 guys the first day of set-up for 8 hours and 2 guys the second day for 4 hours at most; and (3) WE's supervisor was Jeff Wells who could be reached at 317-748-8806. *see* Exhibit D.

29.    On or about October 25, 2017, Steinbrook emailed an 'Add-On Invoice' to Rayes, claiming that it covered "items that had to be adjusted based on your design." *See* Exhibit E.

30.    At no time prior to sending this 'Add-On Invoice' to HPT did anyone at WE advise, quote or even suggest to HPT that there would be additional charges for adjustments made to the booth design or sign, either before or after HPT paid the 9/12/17 Purchase Invoice in full.

31.    Nevertheless, on October 27, 2017, only three days prior to the tradeshow starting, Steinbrook sent Rayes an email, demanding immediate payment of the Add-on Invoice, threatening not to release the shipment until it was paid. *See* Exhibit E.

32.    Having no alternative  but to succumb to WE's demands because of the limited time frame before the tradeshow started,  HPT paid the Add-on Invoice  in the amount of $12,979.10 by  wiring the funds to WE on October 27, 2017. *See*  Exhibit F.

33.    On or about October 28, 2017, Freeman had four men and an electrician at the convention center at 8:00 a.m., ready to unload WE's shipment, per WE's October 18, 2017 email.

34.    When the shipment did not arrive by 10:00 a.m., HPT had to release Freeman's men and incur Freeman's additional charge for rescheduling the pick-up time for later that day.

35.     Despite numerous attempts to contact WE regarding the delayed arrival time, WE did not answer its phones or respond to any of HPT's emails.

36.     It was not until 2:00 p.m. on October 28, 2017 that Freeman's men located some of the pallets that contained the booth's components but refused to touch them until HPT observed the extent of their damage and poor packing materials.

37.     At approximately 3:00 p.m. that same day, HPT began assessing the damage, noting that  (1) among other issues, the remade hanging sign was missing in addition to a display podium, backlighting items and a tablet mount, (2) most of the booth's components were shipped on pallets with little structure instead of in the custom crates noted on the Purchase Invoice and Add-On Invoice; (3) large areas of the booth's components were delaminated, chipped or bubbled, and (4) the majority of the booth's components did not conform with HPT's blueprints.

38.     Consequently, Freeman, with the help of HPT's staff, rushed to make and install a new sign and assemble a make-shift booth from the few components and equipment that were still useable and capable of being repaired before the start of the tradeshow.

39.     In order to accomplish these tasks, HPT had to rent a car to purchase tools and equipment from Home Depot and had to pay its staff overtime for the additional man-hours necessary to remedy the situation.

40.     Between October 28, 2017 and November 1, 2017, HPT continued its attempts to contact WE regarding the booth's non-conformance and missing sign but, to no avail.

41.     On or about November 1, 2017, the remade sign mysteriously appeared in front of HPT's booth. The original sign was never provided to HPT.

42.     During the tradeshow, HPT used the make-shift booth and sign that Freeman and HPT's staff assembled and installed.

43.  At the conclusion of the tradeshow, Freeman and HPT's staff had to repair the pallets, crates and storage materials before disassembling and packing up the booth.

44.  On November 8 and 9, 2017, HPT sent two emails to WE, demanding reimbursement of all monies paid to WE because of the non-conforming goods it received (or did not receive) and the damages it suffered as a result.

45.  On November 14, 2017, a conference call was had between Steinbrook and HPT's CFO, Director of Operations and Director of Marketing regarding HPT's demand for reimbursement but the parties were unable to reach an accord and HPT's demand for reimbursement was ignored.

46.  On or about January 18, 2018, counsel for HPT directed correspondence to WE, demanding that WE reimburse HPT for the damages HPT suffered as a result of WE's breach of contract and fraudulent representations. *See* Exhibit G.

47.  To date, WE has not reimbursed HPT for the damages that HPT suffered as a result of WE's breach of contract and fraudulent representations.

## COUNT I – BREACH OF CONTRACT

48.  HPT restates and re-alleges paragraphs 1 through 47 above as paragraph 48 of Count I of the Complaint as though fully set forth herein.

49.  Based on the foregoing, a valid and enforceable contract existed between the parties under which WE agreed to do the following in exchange for HPT paying the $43,768.35 quoted on the 9/12//17 Purchase Invoice in full prior to fabrication and ordering of materials:

   a.  WE agreed to build, deliver and set up a custom made display booth for HPT that would be manufactured in conformity with HPT's design blueprints;

   b.  WE agreed to construct and set up a hanging sign that complied with SEMA's requirements for HPT's use at the 10/31/7-11/3/17 SEMA tradeshow;

   c.  WE agreed to deliver the booth and sign to the tradeshow in custom crates;

      d.   WE agreed to deliver the booth and sign to the tradeshow themselves, in a timely fashion and at no additional cost;

      e.   WE agreed to provide a team to set-up the booth, at no additional cost; and

      f.   WE agreed to supply a supervisor for the set-up, at no additional cost.

(the "Contract").

      50.    HPT performed all of its obligations under the Contract, including, but not limited to, providing WE with the design blueprints for the custom made display booth and paying WE the $43,768.35 quoted on the 9/12/17 Purchase Invoice, in full, prior to fabrication of the booth and sign and ordering of materials.

      51.    Notwithstanding the above, WE breached the Contract by :

      a.   Failing to construct the booth in conformity with HPT's blueprints;

      b.   Failing to provide HPT with a hanging sign that complied with SEMA's required measurements prior to the start of the tradeshow;

      c.   Failing to deliver the custom made booth components to the tradeshow themselves in a timely fashion;

      d.   Failing to deliver the remade hanging sign with the booth and/or ensure that the sign arrived prior to the tradeshow starting on 10/31/17;

      e.   Having a third party ship the booth's components and sign;

      f.   Failing to ensure that the booth components were shipped in custom crates rather than on defective pallets and skids with little structure;

      g.   Failing to ensure that all of the booth's critical components were delivered;

      h.   Failing to ensure that the booth components, including but not limited to its pedestals, podiums and displays, were not chipped, scuffed, delaminated, bubbling and otherwise damaged when shipped to the tradeshow;

      h.   Failing to ensure that the wall lighting functioned properly and/or filled the backlighting areas as designed;

      i.   Failing to ensure that the podium display tops were mounted to the podium themselves and properly illuminated in accordance with the designs;

     j.  Charging HPT an additional $12,979.10 for adjustments that it allegedly made to the backwall of the booth and for remaking the sign due to WE's own error without ever advising HPT that there would be additional charges for these items or providing HPT with estimates or quotes for these items;

     k.  Delivering the booth's components well past its expected delivery time;

     l.  Failing to provide a team to set-up the booth and sign, as part of its custom exhibit package,

     m.  Failing to have a supervisor available to oversee the set-up of the exhibit, as promised; and

     n.  Otherwise breached the Contract.

52.    WE's breach of the Contact was willful and wanton, vexatious and unreasonable.

53.    As a direct and proximate result of WE breaching the Contract, HPT suffered the following monetary damages:

     a.  $43,768.35  -  purchase price paid to WE in full  prior to fabrication and ordering of materials;

     b.  $12,979.10 - paid to WE on 10/27/17 for the add-on items that were never discussed/quoted;

     c.  $30,509.87  - paid to Freeman (*see* Exhibit G);

     d.  $1,604.35  - rental car fee (*see* Exhibit G);

     e.  $580.04 -  paid to Home Depot for tools used to build/set-up the exhibit (*see* Exhibit G); and

     f.  $5,200.00 -  for the man-hours provided by HPT employees in excess of the total hours planned (*see* Exhibit G);

     g.  Other damages to be determined at trial, in addition to its attorney fees and costs.

54.    HPT is entitled to pre-judgment interest against WE in accordance with the Interest Act, 815  ILCS 205/0.01, *et.seq.*

WHEREFORE, the Plaintiff, HP Tuners LLC, prays that this Court enters judgment in its favor and against the Defendant, Worldly Exhibits, in an amount to be determined at trial that is in excess of the $75,000.00 jurisdictional amount, plus pre-judgment interest, punitive damages, attorney fees and costs and such other relief that the Court deems just and proper.

## COUNT II– FRAUD IN THE INDUCEMENT

55.     HPT restates and re-alleges paragraphs 1 through 54 above as paragraph 55 of Count II of the Complaint as though fully set forth herein.

56.     On or about August 29, 2017, WE, by and through its agent and employee, Bowman, made the following misrepresentations and/or omissions of material facts to HPT when he advised Rayes and/or omitted mentioning to Rayes that:

a.  WE would construct the booth in accordance with HTP's design and blueprints;

b.  WE would deliver HPT's booth and sign to the trade show themselves;

c.  WE would provide a team to set-up the exhibit at the tradeshow, at no additional cost;

d.  WE would provide a supervisor to oversee the set-up at no additional cost;

e.  The booth components would be delivered in custom crates;

f.  Omitted mentioning that WE would be charging HPT for any adjustments made to the original design of the booth or sign ;

g.  Otherwise made fraudulent misrepresentations to HPT or omitted mentioning certain material facts.

57.     Bowman made the above misrepresentations, knowing and/or reasonably believing them to be false.

58.     Bowman's actions in making these misrepresentations were willful and wanton, vexatious and unreasonable.

59.     All of the above misrepresentations and/or omissions were made to induce HPT into entering the Contract with WE and paying WE the purchase price upfront and HPT entered the Contract and paid the purchase price upfront based on these misrepresentations and omissions.

60.     HPT, by and through its employee, Rayes, justifiably relied on these misrepresentations and/or omissions as Rayes was neither given notice nor was otherwise aware of the falsity of Bowman's representations at that time they were made.

61.     Had HPT, by and through its employee, Rayes, known that Bowman intentionally misrepresented these facts, HPT would not have entered the Contract with WE or paid the purchase invoice.

62.     By relying on these misrepresentations, HPT was misled, deceived and damaged.

63.     As a direct and proximate result of these misrepresentations, HPT suffered the monetary damages noted in Count I above in addition to incurring the attorney fees and costs associated with  bringing this lawsuit.

WHEREFORE, the Plaintiff, HP Tuners LLC, prays that this Court enters a judgment in its favor and against the Defendant, Worldly Exhibits that provides, among other things that:  (a) HPT is entitled to damages, including punitive damages, in an amount to be further determined at trial, (b) for payment of HPT's attorney fees and costs, and (c) for such further and other relief as is just and proper.

## COUNT III – BREACH OF ILLINOIS CONSUMER FRAUD AND THE DECEPTIVE BUSINESS PRACTICES ACT
### (Unfair Business Practices)

64.     HPT restates and re-alleges paragraphs 1 through 63 above as paragraph 64 of Count III of the Complaint as though fully set forth herein.

65.     The Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/1 et. seq. (the "ICFA") is a regulatory and remedial statute intended to protect consumers against fraud, unfair methods of competition and other unfair and deceptive business practices.

66.     At all times relevant herein, HPT was a consumer within the meaning of the ICFA. Additionally, at all times relevant herein, WE was in the business of providing consumers with comprehensive event management solutions, including, but not limited to, customized booth and/or tradeshow exhibits and packages that are tailor made for their event.

67.     Conduct is unfair under the ICFA if (a) the practice offends public policy; (b) it is immoral, unethical, oppressive or unscrupulous or (c) it causes substantial injury to consumers.

68.     As a result of the allegations set forth herein, WE, by and through its agents and employees, Bowman and Steinbrook, engaged in unfair  business practices in connection with the purchase, construction, delivery, and set-up of the customized booth and sign that it agreed to custom make for HPT's use at the SEMA tradeshow.

69.     These unfair business practices included but were not limited to   (a) charging HPT an additional $12,979.10 on 10/25/17 for "add-on' items without ever advising HPT that there would be additional charges  for 'adjustments' to the design of the booth or hanging sign, either before or after HPT paid the Purchase Invoice in full; (b) demanding immediate payment of the additional $12,979.10  under threat not to release the shipment of the booth's  components until it was paid; (c) representing to HPT employees that it would deliver the booth and sign to the tradeshow themselves in order to induce HPT into entering the contract  when it knew or reasonably should have known that it had no intention of doing so; (d) representing to HPT employees that it would provide a team to set  up the booth and sign at the  tradeshow in order to induce HPT into entering the contract when it knew or reasonably should have known that it had no intention of doing so; and (e) representing to HPT employees that it would have a supervisor

available at the tradeshow to supervise the set-up of the booth and sign in order to induce HPT into entering the contract when it knew or reasonably should have known that its supervisor would not be available.

70. WE, by and through its agents and employees, Bowman and Steinbrook, intended for HPT and its employees to rely on each of the unfair business practices outlined in the above paragraphs and HPT, by and through its employees, did in fact rely on same.

71. Each of WE's above unfair business practices were done in a willful, wanton, vexatious and unreasonable manner.

72. Each of the unfair business practices outlined above has a substantial nexus to Illinois consumers in that these practices may be followed by WE when soliciting and/or contracting with other Illinois consumers interested in engaging WE to build, deliver and set-up their custom made exhibits for tradeshows and other events.

73 The unfair business practices outlined above have caused substantial injury to HPT, including but not limited to the monetary damages noted in Count I above in addition to the attorney fees and costs it has incurred in bringing this lawsuit.

WHEREFORE, the Plaintiff, HP Tuners LLC, prays that this Court enters a judgment in its favor and against the Defendant, Worldly Exhibits that provides, among other things that: (a) HPT is entitled to damages, including punitive damages, in an amount to be further determined at trial, (b) for payment of HPT's attorney fees and costs, and (c) for such further and other relief as is just and proper.

### COUNT IV – BREACH OF ILLINOIS CONSUMER FRAUD
### AND THE DECEPTIVE BUSINESS PRACTICES ACT
### (Deceptive Acts)

74. HPT restates and re-alleges paragraphs 1 through 73 above as paragraph 74 of Count IV of the Complaint as though fully set forth herein.

75.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 (the "ICFA") is a regulatory and remedial statute intended to protect consumers against fraud, unfair methods of competition and unfair or deceptive acts or practices.

76.     Issues involving misrepresentations and/or concealment of material facts, whether intentional or innocent, are generally treated as deceptive conduct cases under the ICFA.

77.     WE, by and through its agents and employees, Bowman and Steinbrook, intended for HPT and its employees to rely on each of the deceptive business practices outlined in the above paragraphs and HPT, by and through its employees, did in fact rely on same.

78.     Each of WE's deceptive business practices were committed in a willful, wanton, vexatious and unreasonable manner.

79.     WE's misrepresentations and/or concealment of the above material facts, by and through its agents and employees, Bowman and Steinbrook, were intended to and did, in fact, induce HPT into entering the Contract with WE for the construction, delivery and set-up of the custom made booth and sign.

80.     Had Rayes or any other employee of HPT known that WE had no intention of including delivery and set-up of the booth and sign as part of the exhibit package or that WE would demand payment of additional monies after HPT paid the purchase price to WE upfront pursuant to WE's demands, HPT would not have entered the contract with WE for the construction, delivery and set-up of the custom made booth and exhibit.

81.     As a result of the foregoing, HPT suffered damages, including but not limited to the monetary damages noted in Count I above in addition to the fees and costs that it has incurred in bringing this lawsuit.

WHEREFORE, the Plaintiff, HP Tuners LLC, prays that this Court enters a judgment in its favor and against the Defendant, Worldly Exhibits which provides, among other things that:

(a) HPT is entitled to damages, including punitive damages, in an amount to be further determined, (b) for payment of HPT's attorney fees and costs, and (c) for such further and other relief as is just and proper.

**COUNT V – BREACH OF IMPLIED WARRANTY OF FITNESS
FOR A PARTICULAR PURPOSE**

82.      HPT restates and re-alleges paragraphs 1 through 81 above as paragraph 82 of Count V of the Complaint as though fully set forth herein.

83.      At all times mentioned herein, WE, by and through its employees, Bowman and Steinbrook, knew that, as part of the sale and consideration given for the Contract, HPT expected the custom made booth, as well as all of its components, to be constructed in conformity with HPT's blueprints,  delivered in an undamaged condition and fit for HPT's use at the SEMA trade show.

84.      At all times mentioned herein, HPT relied on WE's skill and judgment to construct, deliver and set up the booth and all of its components in accordance with that expectation and  particular purpose.

85.       Notwithstanding WE's knowledge of HPT's particular purpose for engaging WE to construct, deliver and set-up this custom made  booth, WE breached its implied warranty of fitness for a particular purpose by:

    a.  Failing to construct the booth in conformity with HPT's blueprints;

    b.  Failing to ensure that the booths components were delivered in an undamaged condition;

    c.  Failing to ensure that the booth components were delivered in custom crates rather than on defective pallets and skids with little structure;

    d.  Failing to ensure that  all of the booth's critical components were delivered;

e.  Failing to ensure that the booth components, including but not limited to its pedestals, podiums and displays, were not chipped, scuffed, delaminated, bubbling and otherwise damaged when shipped to the tradeshow;

f.  Failing to ensure that the wall lighting functioned properly and/or filled the backlighting areas as designed;

g.  Failing to ensure that the podium display tops were mounted to the podium themselves and properly illuminated in accordance with the designs;

h.  Otherwise breached the implied warranty of fitness.

86.   WE's breach of its implied warranty of fitness for a particular purpose was willful, wanton, vexatious and unreasonable.

87.   As a direct and proximate result of the foregoing, HPT suffered damages, including but not limited to the monetary damages noted in Count I above in addition to the fees and costs that it has incurred in bringing this lawsuit.

WHEREFORE, the Plaintiff, HP Tuners LLC, prays that this Court enters a judgment in its favor and against the Defendant, Worldly Exhibits that provides, among other things that: (a) HPT is entitled to damages, including punitive damages, in an amount to be further determined; (b) for payment of HPT's attorney fees and costs, and (c) for such further and other relief as is just and proper.


Dated: March  21, 2018                    HP Tuners, LLC

                                          By: /s/ Michele J. Braun
                                              One of Its Attorneys


Michele J. Braun
Law Offices of Michele J. Braun
1906 Maplewood Rd.
Northbrook, IL 60062
847-559-8406
Michele @mjbraunlaw.com
ARDC no. 6187398